UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CACHET FINANCIAL SERVICES,<br><br>    Plaintiff,<br><br>    v.<br><br>C&J ASSOCIATES, INC., et al.,<br><br>    Defendants. | Case No. 5:16-cv-06862-EJD<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br>Re: Dkt. No. 194 |

## I. INTRODUCTION

This is a statutory interpleader action initiated by Cachet Financial Services ("Cachet") against eighty-two defendants to resolve conflicting claims to $1,886,546.73 (the "Interpleaded Funds"), which Cachet deposited with this Court. Cachet moves for summary judgment or in the alternative partial summary judgment. At issue in the motion is whether Cachet is entitled to recoup $835,748.83 of the Interpleaded Funds. Defendants and Counterclaimants Pacific Diversified Insurance Services, Inc. ("Pacific") and Robert Talbott, Inc. ("Talbott") (collectively "Defendants") oppose the motion. The following parties join in Defendants' opposition to the motion: Defendant and Counterclaimant Pinnacle Manufacturing Corporation (Dkt. No. 205); Intervenor Gavin De Becker & Associates LP (Dkt. No. 206); and Defendant San Juan Oaks, LLC (Dkt. No. 207). The Court finds it appropriate to take the motion under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b). Based upon all pleadings filed to date, Cachet's motion will be denied.

1

## II. BACKGROUND[1]

Cachet is an electronic Automated Clearing House ("ACH") third party service provider that processes a variety of electronic funds transfers ("EFT") in the form of payroll ACH transfers.[2] The transfers commonly take the form of direct deposit payroll and electronic payment processing. The Interpleaded Funds came into Cachet's possession as a result of its contractual relationship with defendant Pinnacle Workforce Solutions ("Pinnacle"), a company that provides payroll processing services to employers. The remaining eighty-one defendants/counterclaimants are Pinnacle's employer clients who entered into payroll processing agreements with Pinnacle (Higham Decl. Exs. 1-3) and have asserted claims to the Interpleaded Funds.

In March of 2007, Cachet and Pinnacle entered into a "Remarketer Agreement" pursuant to which Cachet provided ACH transaction services for Pinnacle. Succar Decl. Ex 1, Dkt. No. 194-1. Pinnacle provided instructions directing Cachet to debit funds from the accounts of Pinnacle's clients, the employers; to aggregate their funds within a general clearing account maintained for Pinnacle by Cachet ("clearing account"); and to credit specific accounts for the purpose of making ACH payroll payments to the employees of Pinnacle's employer clients. *Id*. at CFS00018. The "Pricing, Billing and Funding" section of the Remarketer Agreement provided in pertinent part as follows:

> CACHET shall deposit funds in [Pinnacle] account(s) for Client trust funds, [Pinnacle] fees, and other settlements authorized by Client to be made to [Pinnacle] within forty-eight (48) hours following receipt of collected funds from Client. . . . [Pinnacle] understands and acknowledges that Cachet is not a bank but that Cachet has requested and received regulatory permission to process EFT transactions through the FRB. [Pinnacle] additionally understands that the FRB requires banks and financial institutions to

---

[1] The Background is a brief summary of the undisputed facts that are relevant to this motion.
[2] Cachet requests judicial notice of an article entitled, "How the ACH Network and ACH Payments Work" and a portion of the 2014 National Automated Clearing House Association ("NACHA") Operating Rules & Guidelines, Incomplete Transactions and the Return of Funding Debt Entries, both of which are available on the NACHA website. Dkt. No. 199. Cachet's request is granted. *See e.g. Rearden LLC v. Rearden Commerce*, 597 F. Supp. 2d 1006, 1013 n.3 (N.D. Cal. 2009) ("The court takes judicial notice of contents of this website and other websites cited herein pursuant to Federal Rule of Evidence 201."), *reversed and remanded on other grounds*, 683 F.3d 1190 (9th Cir. 2012); *Caldwell v. Caldwell*, 420 F. Supp. 2d 1102, 1105 n.3 (N.D. Cal. 2006) (granting judicial notice of a University of California website).

> maintain a ten (10) percent reserve with the FRB to guarantee the EFT transactions processed. [Pinnacle] agrees to make these required funds available and to maintain the required reserve at Cachet for the sole purpose of meeting the required FRB reserve.

*Id*. The "Liability" section of the Remarketer Agreement included the following provision: "[Pinnacle] shall fund any NSF return or other returned item until the item in question has been fully resolved." *Id*. at CFS00019.

On September 27, 2016, Pinnacle's clearing account with Cachet was overdrawn in the amount of $1,395,748.83. Cachet's Separate Stmt. of Undisputed Material Facts ("SSUF") No. 7. Cachet immediately contacted Pinnacle to advise it that its account had been suspended pending complete funding of its existing account overdraft. Succar Decl. ¶ 8. Pinnacle promised to resolve the overdraft by providing a prompt wire transfer payment. *Id*. Cachet advised Pinnacle that two conditions had to be met for Cachet to reinstate service: (1) Pinnacle must resolve the overdraft by providing the wire transfer; and (2) "the ACH collection for the direct deposits be settled within Cachet's clearing account for Pinnacle." *Id*. ¶ 9. Cachet further advised that "[o]nce Pinnacle satisfied its account overdraft, Cachet would then release the collected funds for the direct deposit payments from the clearing account." *Id*. Pinnacle agreed to these terms without notifying any of its employer clients and Cachet processed Pinnacle's collection instructions onto the ACH Network. *Id*. ¶ 10. Pinnacle, however, did not meet its obligation to resolve the overdraft; Pinnacle wired $560,000 instead of the full $1,395,748.83 and the account remained overdrawn by $835,748.83. *Id*.

Cachet immediately contacted Pinnacle regarding the overdraft. *Id*. Pinnacle's staff told Cachet that it did not have access to funds and that the only person who did, Mr. McEwan, was incapacitated due to a medical emergency.[3] *Id*. Nevertheless, Pinnacle's staff assured Cachet that the outstanding balance would be resolved by the next day, September 28, 2016. *Id*.

On September 28, 2016, Cachet had a net sum of $2,608,226.41 in the clearing account after processing Pinnacle's collection instructions. *Id*. ¶ 11. Pinnacle's instructions directed the

---

[3] Cachet requests that the court take judicial notice of the fact that Mr. McEwan pled guilty to wire fraud in connection with the events at issue here. Dkt. No. 208. The request is granted pursuant to Federal Rule of Evidence 201.

transfer of $459,127.04 into Pinnacle's tax clearing account for the benefit of Christopher Ranch LLC, which left $2,149,099.37 in the clearing account. *Id*. Cachet did not receive any further wire transfers from Pinnacle and accordingly re-suspended Pinnacle's account. *Id*. ¶ 12.

On or before October 18, 2016, a number of banks acting on behalf of Pinnacle's clients executed ACH returns totaling $262,552.64, which left a balance of $1,886,546.73 in the clearing account. *Id*. ¶ 14.

Cachet set off Pinnacle's clearing account to recover the $835,748.83 (the overdrawn balance that had existed on September 27, 2016), filed the instant interpleader action in November of 2016 (Dkt. No. 1), and deposited the remaining funds from the clearing account with the court (Dkt. No. 138). Cachet characterizes the setoff as a "routine internal accounting balance." Cachet's Mot. for Summary Judg. 15, Dkt. No. 194. Later Cachet filed a motion for discharge, which the court denied. Dkt. No. 179. The court also ordered Cachet to deposit the $835,748.83 that Cachet had kept (*id.*) and Cachet complied (Dkt. No. 181).

Three Defendants, Pacific, Talbott and Pinnacle Manufacturing Corp. have filed counterclaims against Cachet seeking to recover the amounts Cachet debited from their respective accounts. Dkt. Nos. 140, 149, 150. These three Defendants allege that at the time Cachet debited their accounts Cachet had no intention of crediting their employees' accounts with Defendants' funds. Litigation of the counterclaims is stayed pending completion of the Special Master's claim determination process and submission of the Special Master's final report on distribution of the Interpleaded Funds. Dkt. No. 147.

### III. STANDARDS

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

4

If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. *Id*. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 324. A "genuine issue" of material fact for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. *Id*. ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id*.

## IV. DISCUSSION

A. Cachet's Claim

Cachet contends that it is entitled to recover $835,748.83 of the Interpleaded Funds as a setoff for Pinnacle's overdraft balance either on a priority or a *pro-rata* basis. Cachet reasons that California law upholds the practice of a depository institution recouping overdraft balances

resulting from NSF transactions. In support of this position, Cachet cites to *Miller v. Bank of America*, ("*Miller I*"), 46 Cal.4th 630, 638 (2009); *Miller v. Bank of America*, ("*Miller II*"), 213 Cal. App. 4th 1 (2013); and *DeBartolo v. Bank of America*, No. 08-5553 VRW, 2009 WL 3584125 (N.D. Cal. 2009). None of these cases establish Cachet's right to a setoff under the particular facts of this case. In *Miller I*, account holders who deposited Social Security or other public benefit funds into checking or savings accounts and then overdrew those accounts brought suit to challenge defendant Bank of America's ("Bank") practice of recouping overdrafts and insufficient fund fees from the public benefit funds. The California Supreme Court held that the Bank's practice did not run afoul of the Court's earlier decision in *Kruger v. Wells Fargo Bank*, 11 Cal.3d 352 (1974) (analyzing bank's right to a setoff pursuant to California Civil Code section 3054, the banker's lien act, and holding that bank may not exercise its right of set off against deposits derived from unemployment and disability benefits, which are protected from the claims of creditors), and that the practice was permissible under California Financial Code section 864 (hereinafter "section 864"), which prescribed the manner in which banks may set off debts.

Unlike the Bank in *Miller I*, Cachet is not a bank but an electronic ACH seeking a setoff for an overdraft balance. The "Remarketer Agreement" expressly states that Cachet "is not a bank but that Cachet has requested and received regulatory permission to process EFT transactions through the FRB." *Id*. at CFS00018. Section 864 applies to banks, not to ACHs. Moreover, section 864 was repealed in 2011. Cachet has cited no authority and has not put forth a compelling reason why an ACH, especially an ACH like Cachet who contractually agreed to process EFTs for Pinnacle's clients' payroll, should be able to exercise the right to set off in a manner similar to a bank. Therefore, the court finds that *Miller I* does not provide legal authority for Cachet to set off in this case. The *Miller II* and *DeBartolo* cases similarly raise challenges to a bank's practice of balancing customers' accounts by applying account credits against account debits. *Miller II*, 213 Cal. App. 4th at 1; *DeBartolo v. Bank of America*, 2009 WL 3584125, at *1. Therefore, *Miller II* and *DeBartolo* also provide no legal authority for an ACH such as Cachet to set off in this case.

6

The only case cited by Cachet that bears any similarity to the present case is *Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP*, 201 Cal. App. 4th 368, 386 (2011). In *Lonely Maiden*, film clients used Axium International, Inc. ("Axium") for payroll processing. *Lonely Maiden*, 201 Cal. App. 4th at 373. The film clients and Axium "signed written service agreements which provided that Axium would serve as the joint employer of the cast and crew for each film; the film clients would provide all relevant payroll details to Axium; Axium would calculate, inter alia, wages and withholdings; Axium would invoice the film clients for the amounts due; and once the film clients transferred the invoiced amounts, Axium would issue payroll checks to cast and crew and pay withholdings to the appropriate entities." *Id*. Axium defaulted on a loan and the lender, who had a perfected security interest in Axium's general deposit accounts, foreclosed on the accounts. *Id*. The film clients sued the lender to recover the funds they had paid to Axium, alleging that when Axium defaulted, the lender forced Axium to aggressively invoice and collect money from the film clients. *Id*. at 373-74. The film clients alleged that the invoices amounted to affirmative representations by Axium and the lender that the funds would be used for no other purpose but paying wages, residuals and withholdings. *Id*. at 374. The trial court rejected the film clients' tort claims and various theories of liability based upon trust and agency law and granted summary judgment in favor of the secured lender, and the appellate court affirmed. *Id*. at 387.

The *Lonely Maiden* case is clearly distinguishable from the present case in one critical respect. The lender in *Lonely Maiden* had a perfected security interest in Axium's general deposit accounts. Here, there is no evidence that Cachet has a perfected security interest in the $835,748.83 in the clearing account. To the contrary, Cachet has admitted that it did not have a security interest at all in the funds that it withdrew from Defendants' bank accounts in September of 2016. Cachet's Resp. to Talbott's First Req. for Admis. No. 12 (Dkt. No. 204-4); Cachet's Resp. to Pacific's First Req. for Admis. No. 13 (Dkt. No. 204-4).

Although somewhat unclear, Cachet's next argument appears to assert that because there was an overdraft, Cachet was a creditor and became a "secured" creditor by operation of

7

California Commercial Code section 9312(b)(3). Cachet's Rep. 1, 4. Section 9312(b)(3) provides that "[a] security interest in money may be perfected only by the secured party's taking possession under Section 9313." Cal. Com. Code § 9312(b)(3). Cachet's argument has no merit. As discussed previously, Cachet has not presented evidence that it had a security interest in the $835,748.83. Moreover, section 9312(b)(3) does not create a security interest in money; instead it explains how to perfect a security interest in money.

Cachet next contends that *Lonely Maiden* supports its right of setoff, at least in principle, because the court stated:

> "It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists".)
> In the absence of a trust, Axium and the film clients had no more than a debtor-creditor relationship.

*Lonely Maiden*, 201 Cal. App. 4th at 380 (internal quotes and citation omitted). Applying the principle above, Cachet contends that it collected funds in accordance with Pinnacle's ACH transaction instructions and with the express permission of the employers; that there was no trust relationship created; and that Cachet had a right to seize and apply the monies in its possession after Pinnacle defaulted on its contract with Cachet. Cachet, however, has not presented undisputed evidence that it had a right to use the funds collected from Pinnacle's clients as its own. In the absence of such evidence, the principle cited, which was premised on receipt of funds being "not prohibited from using them as his own," is inapplicable. Moreover, the Remarketer Agreement includes provisions that support Defendants' contention that Cachet's authorization to debit Pinnacle's employers' accounts was limited to the sole purpose of funding payroll and tax obligations. Succar Decl. Ex 1, Dkt. No. 194-1.

B. Defendants' Counterclaims

Cachet contends that all of the counterclaims are moot and should be dismissed. Cachet's Mot. 19, Dkt. No. 200. Cachet also contends that the counterclaimants lack standing. *Id*. The counterclaims are stayed (Dkt. No. 147) and therefore are not the proper subject of this motion for summary judgment.

8

## V. CONCLUSION

For the reasons set forth above, Cachet has failed to establish it is entitled to a setoff on a priority or *pro rata* basis. Accordingly, Cachet's motion for summary judgment is DENIED.[4]

**IT IS SO ORDERED.**

Dated: March 29, 2019

EDWARD J. DAVILA
United States District Judge

---

[4] Cachet argues in a footnote in its reply brief that its motion for summary judgment should be granted in its favor against (1) the parties who joined in the motion because this type of joinder is not explicitly authorized in the Federal Rules of Civil Procedure and (2) any party who failed to file an opposition to the motion. The argument is without merit. The failure to file an opposition to a summary judgment motion "does not excuse the moving party's affirmative duty under Rule 56 to demonstrate its entitlement to judgment as a matter of law." *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003). Cachet has not met this burden.